UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

KAY HOOD ADAMS, et al.                                                        PLAINTIFFS

v.                                                      CIVIL ACTION NO. 3:14cv615-DPJ-FKB

REGIONS BANK, a/k/a Regions Bank, Inc.; et al.                             DEFENDANTS

ORDER

This diversity case is before the Court on Defendants Regions Bank and Regions

Investment Service, Inc.'s ("Regions Trust") (collectively, "Regions") Motion for Summary

Judgment [71] pursuant to Federal Rule of Civil Procedure 56.  The Court, having considered the

memoranda and submissions of the parties, along with the pertinent authorities, finds that the

Motion for Summary Judgment [71] should be granted.  All other motions are deemed moot.

I.      Facts and Procedural History

        With apologies to the casual reader, the facts of this case—though materially

undisputed—are somewhat difficult to follow.  Accordingly, a brief synopsis is in order before

exploring the details.

        A.      Summary of Facts

        In extremely general terms, Plaintiff Kay Hood Adams borrowed $3 million from

Regions.  She secured the loan with Regions stock that was held by a limited partnership her

family owned.  *After* the stock was encumbered, a trust established by Adams' late father became

the 99% owner of the limited partnership that held the Regions stock.  That trust contained a

spendthrift provision that prevented Adams from offering trust assets as security.  After all of

this occurred, Adams and others signed documents making Regions the successor trustee for the

spendthrift trust.  Thus, Regions became the trustee over a trust that held Regions' stock.  Adams

then signed documents allowing Regions to continue holding the stock as trustee despite the apparent conflict of interest.  Eventually, Adams went into default on the loan, and Regions seized the Regions stock she pledged as security.

Adams and her three children—Shannon Lee Adams, Nicholas Sean Adams, and Linden Carole Adams Barefield—subsequently initiated this action in an attempt to recover the seized assets.  They now contend that Regions was not entitled to accept the security Adams pledged for her personal loan due to the spendthrift provision and therefore breached the terms of the trust and unlawfully converted the assets.  They also claim that Regions breached its fiduciary duties by, among other things, taking the stock as collateral, serving as trustee over a trust that controlled its own stock, and failing to diversify the trust assets when the Regions stock began losing value.

Regions generally contends that:  (1) it was contractually allowed to take the collateral Adams pledged; (2) the spendthrift provision did not prevent it from taking the collateral because the collateral was not in the spendthrift trust when pledged; (3) Regions did not breach its fiduciary duties with respect to the account because it was not the trustee when the pledge occurred; and (4) the will creating the spendthrift trust also empowered the trustee to hold Regions stock regardless of risk or the need to diversify.  In addition to these merits-based arguments, Regions points to various documents Adams signed as supporting defenses based on (1) ratification; (2) judicial estoppel; and (3) the applicable statutes of limitations.

2

B.      Facts[1]

        I.      Trust Creation and Structure

On March 2, 2004, Warren Alton Hood, Sr. ("Hood, Sr.") died testate, leaving each of his

four children—including Plaintiff Kay Hood Adams—25 percent of his estate.  FAC [6] ¶¶ 6–7.

The Will placed Adams' quarter of the estate into the "Kay Hood Adams Family Trust" (the

"KHAF Trust") for the benefit of Adams and her descendants.  *Id.* ¶¶ 8, 10.  The Will also

provided that Adams' quarter of the estate would include Hood, Sr.'s 99% limited partnership

interest in Kay Hood Adams Properties, L.P. ("KHAP"), which had been created to hold bank

stock and other securities for the benefit of Hood, Sr.'s children.  J. Hood Dep. [71-1] at 6–7,

11–13; Defs.' Mot., Ex. 2 [71-2] at 2.[2]  Under Article III of the Will, the KHAP partnership

interest was also to be held by the KHAF Trust.  Defs.' Mot., Ex. 2 [71-2] at 2.

        Article X of the Will contained language Plaintiffs describe as a spendthrift provision, the

"primary purpose [of which] was to protect trust assets from claims of creditors of the

beneficiaries."  FAC [6] ¶¶ 11–12; *see* Defs.' Mot., Ex. 2 [71-2] at 25.  Additionally, Article XI

of the Will appointed Warren A. Hood, Jr. and James W. Hood—Adams' brothers—as trustees

of the KHAF Trust.  Defs.' Mot., Ex. 2 [71-2] at 26.

        Significant to the failure-to-diversify issue in this case, Article X vested the trustees with

a variety of powers, including the power to "retain, with no obligation to sell, any property

coming into their hands as Trustees under the terms of this instrument . . . regardless of any lack

---

[1]Regions offers a comprehensive itemization of undisputed facts ("IUF").  Under Rule 56(e), the facts that Plaintiffs do not specifically refute will be deemed undisputed for the purposes of this Motion.

[2]Page numbers refer to ECF pagination.

3

of diversification or risk, without being liable to any person for such retention *unless otherwise specifically provided herein*."  *Id.* at 21 (emphasis added).  Article IV then provides a caveat, stating:  "If any assets held in trust are not income producing, my daughter, Kay Hood Adams, shall have the right to direct the Trustees to dispose of such property."  *Id.* at 4.

ii.      Pledge and Retention Agreements

The assets at the heart of this dispute are 292,439 shares of Regions Financial Corp. stock.  *See* IUF at ¶ 21.  On May 20, 2008, those shares were transferred into Regions Trust Account No. 4014000169.  *See id.* at ¶¶ 20–21.  Shortly thereafter, on May 23, 2008, Adams took out a $3 million personal loan from Regions to cover cash-flow issues at a business for which she was a shareholder, officer, and director.  *Id.* at ¶¶ 14–17.  To secure the loan, Adams and her brother James Hood signed a Commercial Pledge Agreement ("Pledge Agreement") pledging the securities held in Regions Account No. 4014000169 as collateral for Adams' loan.  *Id.* ¶¶ 19–20.

Three months later, on August 27, 2008, Warren Hood, Jr. and James Hood resigned as trustees of the KHAF Trust, and Regions was appointed as the successor trustee.  Adams Dep., Ex. 4 [71-4] at 39–40.  Adams herself signed a document appointing Regions as the successor trustee.  *Id.*  The next month, on September 22, 2008, the Hinds County Chancery Court entered an Order for Partial Distribution of Assets, directing the executors of Hood, Sr.'s estate to distribute his 99% partnership interest in KHAP to the KHAF Trust.  Defs.' Mot., Ex. 3 [71-3].  On that same day, the KHAP Partnership Agreement was amended to substitute the KHAF Trust as the new limited partner in place of Hood, Sr.  Adams Dep., Ex. 5 [71-4].  So at this point,

Regions was the trustee of the KHAF Trust, which was the 99% owner of KHAP, which held the Regions Account containing the Regions Stock.

Following these changes, Regions' Senior Vice President, Frank Parent, sent Adams a January 14, 2009 letter noting that "Regulatory authorities require Regions Bank as Trustee to secure continuing approval from owners/beneficiaries of Trusts holding Regions Bank Stock." Adams Dep., Ex. 7 [71-4].  In response, on January 29, 2009, Adams signed a document requesting that Regions retain and continue to hold the now disputed 292,439 shares of Regions Stock as an asset of KHAP (the "Retention Agreement").  *Id.*  The agreement specifically acknowledged the conflict of interest created by Regions holding its own stock in an account for which it had investment authority, as well as Regions' policy to diversify assets held in trust.  *Id.* The Retention Agreement also stated that the request to retain the Regions Stock "shall be ongoing and continue in force until such time as we give written notice to the Bank of its termination."  *Id.*

Although the precise details of the transaction remain murky, it appears that around April 2009, KHAP was liquidated and the Regions Account, one of KHAP's assets, became an asset of the KHAF Trust.  *See* IUF at ¶ 31 (citing Hood Dep. [71-1] at 44–45).

iii.    Reformation Action

To further complicate matters, the parties later discovered that Adams' brother James Hood had mistakenly signed the Pledge Agreement as "trustee" for KHAP, rather than as a "manager" of its general partner, as would be necessary to create a binding contract under KHAP's partnership agreement.  *Id.* at ¶ 33; *see also* Defs.' Mot., Ex. 8 [71-8].  This error jeopardized the validity of the Pledge Agreement.  And by then, the Regions Account was

already part of the KHAF Trust, so the spendthrift provision precluded the beneficiaries, including Adams, from again offering the asset as collateral for her personal loan in a new pledge agreement.

To fix that problem, Regions, Adams, and others filed a Petition for Reformation of Pledge Agreement in the Hinds County Chancery Court (the "Reformation Action"), seeking to reform the Pledge Agreement to ensure that the Regions Account would continue to provide security for Adams' loan. Defs.' Mot., Ex. 8 [71-8]. The chancery court agreed to the request and entered an order on September 30, 2010, reforming the Pledge Agreement as requested in the petition, finding that "[t]he Pledge Agreement was executed as a result of a mutual mistake among the parties who clearly intended to pledge the [Regions Account] as security for [Adams'] Loan." Defs.' Mot., Ex. 13 [71-13]. In other words, the chancellor held that Adams and the other Plaintiffs intended to pledge the Regions Account as collateral and therefore reformed the Pledge Agreement in a way that avoided the spendthrift provision.

### iv.   Diversification Request and Seizure

In July 2011, after the value of the Regions stock had declined significantly, Adams allegedly spoke with Parent and others at Regions about diversifying the assets of the KHAF Trust such that the assets would provide a sufficient yield to cover the interest payments on her loan. FAC [6] ¶ 38. Despite this conversation and the continued decline in Regions' share value, Adams allegedly learned in early August 2011 that Regions had still not taken any steps to diversify. Id. ¶ 40. Finally, on November 10, 2011, Regions seized the assets of the Regions Account to satisfy the loan, thus depleting the KHAF Trust of substantially all of its value. Id. ¶¶ 50–52.

C.    Procedural History

On August 7, 2014, Plaintiffs filed suit in this Court against Regions asserting claims for breach of fiduciary duties, negligence, breach of contract, conversion, unjust enrichment, and punitive damages.  Compl. [1].  Plaintiffs subsequently amended their Complaint to add a claim for minority-shareholder oppression.  *See* FAC [6].

In January 2015, Regions moved to dismiss Adams' Complaint [28], which the Court granted as to the minority-shareholder-oppression claims, but denied as to all other claims.  *See* April 27, 2015 Order [43].  Regions now moves for summary judgment against Adams and her children.  The Court has personal and subject-matter jurisdiction and is prepared to rule.

II.    Standard of Review

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence,

factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). In this case, most material facts are undisputed, and most issues are legal in nature.

Finally, the Court feels compelled to observe that the parties have failed to fully comply with Rule 56. The problem is more pronounced with respect to Plaintiffs' response, which includes numerous assertions that are either legally or factually unsupported. Conclusory allegations, unsubstantiated assertions, and legalistic arguments are not sufficient to demonstrate a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

Moreover, Rule 56(c)(1) states that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to *particular* parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." (emphasis added). Rule 56(c)(3) adds that "[t]he court need consider only the cited materials, but it may consider other materials in the record." And under Rule 56(e), "[i]f a party fails to properly support an assertion of fact . . . , the court may: . . . (2) consider the fact undisputed for purposes of the motion."

Here, the Court has not weighed conclusory assertions made without explanation, supporting facts, or legal authority. And though the Court attempts to consider the record as a

whole, there is no "duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal W. Packaging Corp.*, 602 F.3d 374, 379 80 (5th Cir. 2010) (citation and quotation marks omitted).

III.     Analysis

As stated previously, Plaintiffs seek recovery on the following grounds:  (1) breach of fiduciary duties; (2) negligence; (3) breach of contract; (4) conversion; (5) unjust enrichment; and (6) punitive damages.  The Court will first consider Defendants' standing argument and will then proceed to address each of the above claims for relief in turn.

A.     Standing

Before addressing the merits, the Court must consider Regions' contention that the three Adams children named as Plaintiffs in this action lack standing to pursue their claims.  Regions argues that the children "had no vested interest in the Trust because their interest was contingent on a condition precedent—that Kay Adams would not designate anyone other than her children" as beneficiaries.  Defs.' Mem. [72] at 26.  This is premised on Hood, Sr.'s Will, which states that upon Adams' death, the remainder of the trust shall be conveyed to "such persons and/or entities as my daughter, Kay Hood Adams, may designate" and that only if no person or entity is designated will the entire trust be automatically distributed among her children.  Defs.' Mot., Ex. 2 [71-2] at 4.  Based on this language, Regions characterizes the children's interest as "nothing more than a remote contingent expectancy, subject to the ability of Adams to include or not include anyone in the world as a beneficiary of her trust or estate."  Defs.' Mem. [72] at 25–26.

Plaintiffs fail to respond directly to this point.  The only authority cited in their memorandum is a treatise passage regarding the required legal capacity of beneficiaries, which

does not directly bear on the standing of contingent beneficiaries.  *See* Pls.' Mem. [77] at 19.

Furthermore, although a present right to future possession can be considered a vested estate

under Mississippi law even if it is capable of being defeated by some future event, *Hays v. Cole*,

221 Miss. 459, 471 (1954), Plaintiffs have offered no evidence from which the Court could find

that the Adams children have a present right to the remainder of the trust upon Adams' death.

As such, the Court finds that Plaintiffs have failed to make a sufficient showing that the Adams

children have standing to pursue this action.  All claims raised by these three Plaintiffs are

therefore dismissed.[3]

   B.   Breach of Fiduciary Duties

Adams alleges that Regions breached its fiduciary duties as an investment agent for

KHAP and as trustee of the KHAF Trust based on twelve separate actions, eleven of which

survived the motion to dismiss.  They include Regions' alleged failure to:  (1) comply with the

terms of the spendthrift trust; (2) protect trust assets from creditors, including Regions; (3) assure

no self-dealing at Plaintiffs' expense; (4) avoid an inherent conflict of interest; (5) decline the

trustee relationship due to a conflict of interest; (6) follow Regions' internal controls; (7) protect

trust assets, especially as Regions stock was declining in value; (8) adopt and follow a suitable

investment strategy; (9) properly manage trust assets; (10) act in the best interest of the

beneficiaries; and (11) comply with statutory obligations, including Mississippi Code Section

91-13-3.  *See* FAC [6] ¶ 60; Pls.' Resp. [77] at 2–13.

Regions disputes each of these claims on the merits, but it also asserts that the fiduciary-

duty claims are barred by either the applicable statute of limitations, ratification, or by judicial

_____

[3]Regardless, the claims would also fail for the same reasons that block Adams' claims.

estoppel.  Defs.' Mem. [72] at 12–20.  The Court will first consider the statute-of-limitations argument, beginning with those claims that are unrelated to the diversification issue.

> 1.  Statute of Limitations Re Breach-of-Fiduciary-Duty Claims Unrelated to Diversification

Mississippi's general three-year statute of limitations applies to breach-of-fiduciary-duty claims.  *See* Miss. Code Ann. § 15-1-49(2).  And because Adams filed her original Complaint on August 7, 2014, all causes of action accruing before August 7, 2011, are time-barred.  *Id.*  The parties agree on these points, but they dispute the accrual date.

Under Mississippi law, "[i]n actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury."  *Id.*  Assuming this provision applies, the burden is on the plaintiff to prove that the statue of limitations should be tolled.  *Archer v. Nissan Motor Acceptance Corp.*, 633 F. Supp. 2d 259, 265 (S.D. Miss. 2007); *see also Barnes ex rel. Barnes v. Koppers, Inc.*, 534 F.3d 357, 365 (5th Cir. 2008) ("[T]he plaintiff must, as the proponent of a defense to the state statute of limitation, carry [his] burden to prove that [he] is entitled to the benefit of the discovery rule.").  Also, Mississippi courts interpreting the discovery rule have held that to benefit from it, the plaintiff must be "reasonably diligent in investigating his or her injuries."  *Neglen v. Breazeale*, 945 So. 2d 988, 990–91 (Miss. 2006).

In this case, the injuries unrelated to diversification stem from Regions' position as the successor trustee over a spendthrift trust that would later hold Regions' own stock.  That relationship was established no later than April 2009, when KHAP was liquidated.  So the question is whether Adams has met her burden of showing that she did not know, and could not

11

have reasonably discovered, these injuries in the time that passed from April 2009 to August 7, 2011, the date the statutory window closes.

Adams fails to meet this burden because she signed various documents and engaged in other actions that provided notice before August 7, 2011.  To begin, she signed the Pledge Agreement when she acquired the loan on May 23, 2008, and therefore knew by that date that she had offered the Regions stock to secure her $3,000,000 debt.  *See* Adams Dep., Ex. 2 [71-4] at 31.  She also knew that the stock was held in the Regions Account.  *Id.*  On August 27, 2008, Adams signed the Resignation of Trustee and Appointment of Successor Trustee, which plainly states that "[t]he Beneficiary [Adams] hereby appoints Regions Bank as the Trustee of the Trust."  Adams Dep., Ex. 4 [71-4] at 39–40.  And on September 22, 2008, the chancery court entered an order distributing Hood, Sr.'s 99% interest in the KHAP to the KHAF Trust.  *See* IUF at ¶ 23; Defs.' Mot., Ex. 3 [71-3].  Thus, by this time, Adams had actual knowledge that she had assisted in appointing Regions as trustee for the KHAP Trust, a spendthrift trust, and that the trust owned 99% of the limited partnership that held the Regions stock she had previously offered as security for her loan.

Then, on January 29, 2009, Adams signed a Request for Retention of Securities in Irrevocable Trust.  Adams Dep., Ex. 7 [71-4] at 45–46.  That document stated:

### Possible Conflicts of Interest

We realize that the Bank's policy is not to retain its own stock and the stock of certain other companies in accounts for which it has investment authority because it might be difficult for the Bank, when recommending an investment action with respect to such stock, to provide completely independent investment advice.

*Id.* at 45 (emphasis in original).

"In Mississippi, a person is charged with knowing the contents of any document that [s]he executes." *Russell v. Performance Toyota, Inc.*, 826 So. 2d 719, 725 (Miss. 2002). Adams is therefore charged with knowing what she signed—*i.e.*, that she had pledged Regions stock as collateral for her loan, that Regions would take the collateral upon default, that she and her siblings had appointed Regions as successor trustee for the KAHF Trust, that Regions had a conflict of interest with respect to the pledged stock, and that using the stock as collateral might violate Regions' internal policies. These are the very issues that buttress her breach-of-fiduciary-duty claim.

Even assuming Adams lacked knowledge of these facts, she gained—or at least should have gained—that knowledge when she participated in the Reformation Action. In February 2010, Regions, along with KHAP, the KHAF Trust, and *each* of the Plaintiffs in this action, filed a Petition for Reformation of Pledge Agreement in the Mississippi Chancery Court. Defs.' Mot., Ex. 8 [71-8]. The Reformation Action sought to correct a typographical error that compromised the validity of the Pledge Agreement. *See id.* at 4–5. Significantly, the very purpose of the Reformation Action was to ensure the spendthrift provision would not prevent Regions from reaching the Regions Account that Adams offered as collateral for her loan.

This became even more clear after the chancery court appointed a guardian ad litem to review the Petition. After interviewing Adams and others, the guardian issued a report on August 5, 2010. Guardian's Report [71-12]. The guardian provided his report to the parties, IOF [71] at ¶ 41, and concluded therein as follows:

> The Petitioners seek reformation of the Pledge [Agreement] so the Note will be clearly secured by the assets of the [KHAF] Trust as of the May 23, 2008 date of the Note. As it stands now, the Note may be unsecured, and if so, the assets of the [KHAF] Trust would be unencumbered by the Note. Without reformation of

> the Pledge as requested in the Petition, the Note may remain unsecured, and if so, the assets of the [KHAF] Trust would remain unencumbered by the Note. *This is because after the Note and Pledge [Agreement] were made, the Partnership distributed its assets to the [KHAF] Trust, which has a spendthrift provision that would likely prohibit the [KHAF] Trust from now securing the Note with its assets.*

Guardian's Report [71-12] at 5–6 (emphasis added).

In other words, the guardian explained that the Pledge Agreement was signed before the Regions Account became part of the KHAF Trust with its spendthrift provision, and the petitioners in that action—including Adams—sought retroactive reformation of a typographical error to make sure the spendthrift provision of the trust would *not* apply. The guardian then explained the consequences of granting the reformation each Plaintiff requested:

> [I]f there is a default in the Note, some or all of those assets [the Regions Account] could be sold by Regions Bank to satisfy the Note, and those assets so sold would then no longer be available to or owned by the beneficiaries and/or contingent remainder beneficiaries of the [KHAF] Trust.

*Id.* at 6. He likewise explained the consequences of denying relief: "If the Court denies the reformation relief sought in the Petition, those assets may remain unencumbered by the Note and could pass in accordance with the Trust free and clear of the Note." *Id.* Finally, the guardian noted, "I have no reasonable doubt that the individuals I interviewed, as set forth herein [including Adams and her attorney], understand the effect, as described herein, on the assets of the Trust and their respective interests in the Trust if the Court grants the reformation relief sought in the Petition." *Id.* at 7–8.

On September 30, 2010, the chancery court accepted the guardian's report and granted the reformation petition. In doing so, it held that "the parties [ ] clearly intended to pledge the Collateral [Regions Account] as security for [Adams'] Loan." Chancery Court Order [71-13] at

14

6. Thus, at least by September 30, 2010, Adams knew the basis of these claims or would have discovered them with even a cursory review of the Reformation Action for which she was a petitioner.[4]

Adams spends little time directly addressing these statute-of-limitations arguments, but she does offer points throughout other portions of her memorandum that could be relevant to that defense. First, she argues that she lacked capacity to sign the Request for Retention of Securities in Irrevocable Trust. Pls.' Response [77] at 8. This misses the point. Whether or not she had the legal capacity to sign that document, she signed it. And under Mississippi law, she is presumed to know its contents. *Russell*, 826 So. 2d at 725. She presents no authority to the contrary.

Second, Adams asserts that she learned little from the Reformation Action because she "did not have separate counsel advising [her]" and signed only the initial petition. Pls.' Resp. [77] at 16. As an initial matter, Adams fails to support her factual assertion regarding the lack of counsel. And while her attorney may not have made a formal appearance in the case, he did assist her. The guardian stated in his report, "In my investigation I conducted the following interviews . . . Kay Hood Adams on June 11, 2010 in person with her Attorney, Olen C. Bryan, Jr." Guardian's Report [71-12] at 3. In any event, the question is whether Adams discovered the facts, or could have discovered them with reasonable diligence. Miss. Code Ann. § 15-1-49(2). Adams cannot, as a matter of law, meet this burden in light of the documents she signed before

---

[4]These facts also establish judicial estoppel with respect to any claims based on Regions' acceptance of the Regions Account as collateral or the post-default seizure of that collateral. *See Clark v. Neese*, 131 So. 3d 556, 562 (Miss. 2013) (outlining elements of judicial estoppel). Because of the statute-of-limitations ruling, the Court will not further address judicial estoppel.

the Reformation Action; her interview with the guardian regarding her intent as to the Regions Account; the guardian's report, which he provided to her; and the chancellor's judgment.  As a named petitioner in the Reformation Action, Adams could have easily obtained a copy of the judgment, assuming she did not know the outcome of her own case.

Third, Adams argues that the claim did not accrue because Regions "failed to make required disclosures" and misrepresented the need for the Retention Agreement, and that, as a result, she "did not know [her] rights as [a] spendthrift beneficiar[y]."  Pls.' Resp. [77] at 17. Again, however, the issue is notice.  Regions asked Adams to sign a document acknowledging its conflict of interest, and Adams joined Regions in a legal action for the very purpose of evading the reach of the spendthrift provision she now says Regions should have followed. Moreover, Adams cites no record evidence demonstrating that any such non-disclosures prevented her from discovering her injury, and she has not adequately explained why she would not have known the issues at least by the end of the Reformation Action.

Finally, Adams states that Regions cannot point to any evidence that she knew her rights. But this flips the burden of persuasion because Adams is required to show that she is entitled to the benefit of the discovery rule (assuming it applies in this context).  *Barnes ex rel. Barnes*, 534 F.3d at 365.  On the record before the Court, Adams has failed to meet that burden with respect to her breach-of-fiduciary-duty claims not related to diversification.

2.      Diversification-Related Breach-of-Fiduciary-Duty Claims

There is a strong argument that these claims, or at least some of them, are likewise stale. There is no dispute in the record that Adams had a telephonic conference in July 2011 with Regions regarding the lack of diversification and the decline in the Regions Account.  Thus, she was on notice of the lack of diversification before the August 7, 2011 statutory window. Nevertheless, the diversification-related breach-of-fiduciary-duty claims (subparts 7 through 11 of her claim), otherwise fail on the merits.

Regions' failure to diversify can be traced to Hood, Sr.'s Will.  Article VIII states that the trustee, which later became Regions, was "vested with the [ ] additional power[] . . .

> To retain, with *no obligation to sell*, any property coming into their hands as Trustees under the terms of this instrument, including stock in AmSouth Bancorp. [now Regions Bank], whether or not the same would be treated as legal for the investment of trust funds and *regardless of any lack of diversification or risk, without being liable* to any person for such retention *unless otherwise specifically provided herein . . . .*

Hood Will [71-2] at 21 (emphasis added).[5]

Though that provision may seem odd, Hood, Sr., was the former chairman of Deposit Guaranty National Bank, which eventually became Regions through a series of acquisitions.  In addition, he provided an out.  Article IV of the Will provides:  "If any assets held in trust are not income producing, my daughter, Kay Hood Adams, shall have the right to direct the Trustee to dispose of such property."  *Id.* at 4.  In other words, the trustee faced no liability for holding the property, but Adams had authority to direct the trustee to sell poorly performing assets.

---

[5]Adams disputes whether the AmSouth Bancorp. stock became the Regions stock, but has not offered record evidence or legal authority to rebut Regions' position on this point. Moreover, the provision applies to "any property."  *Id.*

As Regions notes, Adams later signed the Retention Agreement, in which she acknowledged the following:

### Diversification

We also understand that the Bank's policy is to diversify assets held in trust where concentrations in the equity securities of one issuer exist. Concentrations pose an enhanced risk of substantial reductions in the value of the overall portfolio. In practice this policy of Diversification may mean the liquidation of securities constituting concentrations.

We understand that under any of the above circumstances or other circumstances if Conflict of Interest or Diversification is not an issue, the Bank has the authority to sell part or all of the security and would do so pursuant to its policy were it not for this request.

We understand and agree that this request to hold the security listed above shall be ongoing and continue in force *until such time as we give written notice* to the Bank of its termination. This agreement shall be binding on the parties who sign this instrument and on those persons the parties signing this instrument can bind under the virtual representation provisions of the applicable state or federal law.

We hereby agree to release, indemnify and hold harmless the Bank from any and all claims, lawsuits and other actions which may result from the continued retention of the above listed stock including any attorneys' fees and other costs it may incur in defending actions or claims pursuant to compliance with this instrument.

Adams Dep., Ex. 7 [71-4] at 45–46 (emphasis added).

In sum, it was Hood, Sr.'s intent to give the trustee power to hold the trust assets regardless of risk and without threat of litigation unless Adams directed it to sell a poorly performing investment. Hood Will [72-2] Art. IV, X. Adams then executed a Retention Agreement that specifically referenced the now disputed Regions stock, in which she agreed to continued retention absent written notice. It is undisputed that Adams never provided written notice.

18

Adams' primary response is that, as a spendthrift, she was incompetent to sign the

Retention Agreement.  *See* Pls.' Resp. [77] at 3.  She contends that "a spendthrift is presumed

not to be able to manage assets."  *Id.*; *see also id.* at 7–8 ("Hood, Sr.'s Will provided that Kay

Adams would receive the income from the Trust during her life and could appoint the successors

to her beneficial interest.  No other power was given Kay Adams under the Will."); *id.* at 8

("Adams possessed no right to dictate anything other than a limited testamentary power of

appointment."); *id.* at 9 ("She had no power, right or standing to direct Regions to do

anything.").

This argument is nether factually nor legally supported.  For starters, the argument that

Adams had no authority under the KHAF Trust to "direct Regions to do anything," *id.*, is

demonstrably false.  She had the authority under Article IV to "direct [Regions] to dispose of

[poorly performing] property."  Hood Will [72-2] at 4.  Indeed, she attempted to exercise that

very right in July 2011, when she allegedly instructed Regions to diversify the assets.[6]

As for Adams' legal authority, she seems to misconstrue the treatise that forms the sole

basis for her argument.  She cites Bogert, The Law of Trusts and Trustees § 168, contending that

it equates spendthrift beneficiaries to other individuals who lack competence to sign contracts.

But that section does not appear to address this particular issue nor to use the term "spendthrift"

in this context.

Adams also cites § 941, which states that "[c]onsent of beneficiaries of spendthrift trusts

should be invalid if they directly or indirectly . . . make [the beneficiary's interest] liable to his

---

[6]If Adams is correct that she lacked the capacity to tell Regions "to do anything," then
her alleged instructions to diversify in July 2011 would be irrelevant, and Regions failure to do
so would be within its powers found in Article X of the Will.

19

debts." Bogert, Trusts and Trustees § 941. But the authority upon which Bogert relies holds that the beneficiary's power is primarily determined by the intent of the testator or settlor of the trust. *See Cowan v. Hamilton Nat. Bank*, 146 S.W. 2d 359, 368 (Tenn. 1941) (holding that spendthrift beneficiary has no power to consent to pledge of trust property where testator devised property in trust specifically to protect against "any voluntary, or induced, control or disposition" of trust assets). By comparison, Article IV of Hood's Will explicitly grants Adams the power to dispose of trust assets, thereby indicating no intent to constrain her authority in this regard. So while the spendthrift provision may have prevented Adams from using trust assets to secure loans, it did not bar her from exercising her authority to direct the trustee to sell assets—the subject matter of the Retention Agreement.

Adams also argues that the Retention Agreement is void because Regions misrepresented the need for it or somehow failed to explain the beneficiaries' rights regarding it. The cover letter to the Retention Agreement stated that "[r]egulatory authorities require Regions Bank as Trustee to secure continuing approval . . . ." Letter [71-4] at 44. Adams notes that Regions' portfolio manager testified that he had no knowledge of a federal regulation requiring the Retention Agreement. Mounzenmay Dep., Ex. H [77-8] at 33. But even assuming this was a mistake that would void the agreement, the Retention Agreement Adams signed *before* KHAP was liquidated and the Regions stock became an asset of the KAHF trust appears to comply with the FDIC Trust Examination Manual.[7]

---

[7]*See* FDIC Trust Examination Manual § 8.A.3 (stating that investments involving "the purchase or retention of own-institution stock . . . should not be made unless (1) lawfully authorized by the instrument creating the trust relationship, or (2) a court order, local law, or prior written approval has been obtained from all interested parties.").

Finally, Adams contends that the failure to diversify violated Mississippi Code Section

91-13-3, which states as follows:

> In acquiring, investing, reinvesting, exchanging, retaining, selling, and managing
> property held in fiduciary capacity, the fiduciary shall exercise the judgment and
> care under the circumstances then prevailing which men of prudence, discretion,
> and intelligence exercise in the management of their own affairs, not in regard to
> speculation, but in regard to the permanent disposition of their funds, considering
> the probable income as well as the probable safety of their capital.

The more specific duty to diversify is defined by the Uniform Prudent Investor Act, which states:

"A trustee shall diversify the investments of the trust unless the trustee reasonably determines

that, because of special circumstances, the purposes of the trust are better served without

diversifying."  Miss. Code Ann. § 91-9-605.

Special circumstances exist in this case.  First, it was Hood, Sr.'s express intent to give

Regions the power to retain trust property—which ultimately included the Regions

Account—without regard to "diversification or risk" and without liability.  Hood Will [72-2]

Art. X; *see also* Defs.' Mem. [72] at 10.  Second, Adams approved the retention of the stock by

signing the Retention Agreement.

In sum, Article X gave Regions the authority to retain the Regions Account without

regard to diversification or risk provided that Adams did not exercise her authority under Article

IV to instruct Regions to sell.  Adams signed a Retention Agreement expressly referencing this

specific stock and agreed to give written notice if she exercised her right to instruct Regions to

dispose of it.  She provided no such written notice.  Thus, Regions did not breach its duties by

failing to diversify.

For the aforementioned reasons, Defendants' Motion is granted as to all of Adams'

breach-of-fiduciary-duty claims.

C.      Negligence

Adams alleges that Regions was negligent for "fail[ing] to exercise reasonable care and skill and undertaking to perform such trust services for Plaintiffs."  FAC [6] ¶ 67.  Regions interprets this claim as "a broad reiteration of their breach of fiduciary duty claims" and thus raises the same grounds for dismissal it raised regarding the fiduciary-duty claims.  Defs.' Mem. [72] at 21.  Adams does not dispute this characterization and dedicates just two sentences of her Response to this issue—with no citation to record evidence.  *See* Pls.' Resp. [77] at 17.  She simply states that "Plaintiffs have demonstrated the existence of duties owed by Regions, as Successor Trustee, the breach of those duties and the causative damages, *i.e*., the entire depletion of Trust assets held for their benefit."  *Id.*

Because the only duty Adams references in the pleadings and supporting memoranda is Regions' fiduciary duty, the Court agrees with Defendants as to the nature of the claim.  So, even assuming these bare conclusions offered to support the negligence claim are sufficient to survive summary judgment, the claim faces the same problems as the fiduciary-duty claims.  As such, the Motion is granted.

D.      Breach of Contract

Despite broader averments in the FAC, the spendthrift-trust provision is the only contract language Adams specifically identifies as having been breached.  *See* Pls.' Resp. [77] at 3, 18.[8]

Defendants again assert that there was no breach, that the claim is time barred, that Adams is

---

[8]Plaintiffs' breach-of-contract response also generally mentions Defendants' failure to diversify, but they fail to reference any applicable contract provisions.  *See id.* at 18.  And as discussed *supra*, Defendants were vested with the power to retain trust property regardless of the risk or lack of diversification.  *See* Hood Will [71-2] at Art. X.

judicially estopped, and that Adams ratified Regions' actions.  In addressing this claim, the Court will focus on the statute of limitations argument, though actual breach is also not apparent for the other reasons Regions urges.

It is well settled that "[i]n Mississippi, a breach of contract claim accrues at the time of the breach regardless of when damages resulting from the breach occur."  *First Trust Nat'l Ass'n v. First Nat'l Bank of Commerce*, 220 F.3d 331, 334 (5th Cir. 2000).  As a reminder, the spendthrift provision Regions allegedly breached stated that "[n]o part of any trust under this will . . . shall be attachable, assignable, or liable to be taken at law or in equity for or on account of any debt, obligation or contract of any beneficiary . . . ."  Hood Will [71-2] Art. X(A).  Thus, *assuming* Regions breached this provision, it happened when the already encumbered Regions Account came under the control of the KHAF Trust.  That would have been in 2009, or at the very latest in September 2010 when the chancery court entered its order in the Reformation Action.  Adams filed suit more than three years later.

Finally, Adams has not met her burden of showing that she could not have discovered the fact that she encumbered the Regions Account before it entered the spendthrift trust.  As discussed above, notice existed at least by the time the Reformation Action concluded.  *See supra* at 11–15.[9]  Consequently, the Court finds that the Motion should be granted as to the breach-of-contract claim.

---

[9]Again, the time bar removes the need to deeply address the other defenses.  That said, Plaintiffs should be judicially estopped from claiming breach of the spendthrift-trust provision after having convinced a state-court judge to reform the Pledge Agreement so the Regions Account could continue to offer security for Adams' loan.  *See Clark*, 131 So. 3d at 562.

E.      Conversion

Adams avers that "Regions wrongfully converted funds belonging to Plaintiffs . . . to satisfy their own purposes" and "wrongfully misappropriated [] trust assets for their own benefit."  FAC [6] ¶¶ 74–75.  "To make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand."  *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So. 2d 767, 774 (Miss. 2004) (quoting *First Investors Corp. v. Rayner*, 738 So. 2d 228, 234–35 (Miss. 1999)) (internal quotation marks omitted).  "Thus, there is a conversion only when there is an 'intent to exercise dominion or control over goods which is inconsistent with the true owner's right.'"  *Id.*

Regions contends that Adams cannot prove the "wrongful possession" element because Regions was in rightful possession of the trust account and acted within its rights as a secured creditor in seizing the Regions Account when Adams defaulted on her personal loan.  Defs.' Mem. [72] at 23.  Indeed, pursuant to the chancery court's order in the Reformation Action, Regions clearly held a valid security interest in the assets contained in the trust account.  And, after default, a secured party is within their rights under Mississippi law to "reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure."  Miss. Code Ann. § 75-9-601(a)(1).

Adams does not dispute that she defaulted, but contends that "[t]he seizure of Trust assets held for the benefit of Adams, the spendthrift, is not justified by the debtor's default."  Pls.' Resp. [77] at 18.  She offers no legal support for this proposition, relying instead on the assertions that Regions was in wrongful possession because of its "inherent conflict of interest"

and because "Regions the trustee failed to protect the beneficiaries from Regions the creditor."
*Id.*  But Regions was a secured creditor under the Pledge Agreement before it became the trustee
of the KHAF Trust and long before the Regions Account became part of the KHAF Trust.  And
in any event, the chancery court blessed the validity of the security in the Reformation Action.
Thus, the record evidence is insufficient to support a conversion claim.  The Motion is therefore
granted.[10]

F.      Unjust Enrichment

Adams appears to base her unjust enrichment claim on the same conduct as the
conversion claim—the seizure of the Regions Account as collateral for the promissory note.  *See*
FAC [6] ¶ 78 ("As a result of the conduct described above, Regions has been unjustly enriched at
the expense of Plaintiffs.").  Unjust enrichment is an equitable claim that "only applies to
situations where there is no legal contract and 'the person sought to be charged is in possession
of money or property which in good conscience and justice he should not retain but should
deliver to another.'"  *Powell v. Campbell*, 912 So. 2d 978, 982 (Miss. 2005) (quoting *Koval v.
Koval*, 576 So. 2d 134, 136 (Miss. 1991)).  "The law is clear that unjust enrichment applies when
one party has mistakenly paid another party . . . [and] where no legal contract exists."  *Willis v.
Rehab Solutions, PLLC*, 82 So. 2d 583, 588 (Miss. 2012).

---

[10]Here too, Adams is judicially estopped.  *See Clark*, 131 So. 3d at 562 (outlining
elements of judicial estoppel).  Regions would suffer clear prejudice if Adams were allowed to
receive a $3 million loan secured by the Regions Account, convince a judge that Regions had a
valid security interest in the account, then default on the loan and argue that Regions lacked a
valid security interest.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (noting that
judicial estoppel applies "especially if it be to the prejudice of the party who has acquiesced in
the position formerly taken").

In support of its Motion, Regions contends that it was not unjustly enriched by the seizure because its conduct was "lawful and in accordance with the terms of the Pledge Agreement that [Adams] ratified as a valid transaction."  Defs.' Mem. [72] at 24.  Adams offers no evidence to rebut this assertion or to show that Regions has been unjustly enriched by retaining the seized property upon her default.  Moreover, she has not alleged that Regions was paid by mistake or that the Pledge Agreement was not a valid contract.[11]  Accordingly, the Court finds that the Motion is due to be granted as to the unjust enrichment claim.

III.    Conclusion

The Court has considered all arguments.  Those not expressly addressed would not change the result.  And for the foregoing reasons, the Court finds that Defendants' Motion for Summary Judgment [71] should be granted.  All other pending motions are therefore rendered moot.  A separate judgement will be entered under Rule 58 of the Federal Rules of Civil Procedure.

**SO ORDERED AND ADJUDGED** this the 6th day of January, 2016.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE

---

[11]In fact, Plaintiffs fail to make any argument at all as to the unjust-enrichment claim in their Response.  *See generally* Pls.' Resp. [77].

26